FILED
2015 Sep-01  PM 04:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **JOHN LYNN, FARRAH LYNN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:14-CV-2208-VEH** |
| | ) | |
| **SHENITHA WILSON, individually,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## <u>MEMORANDUM OPINION</u>

This is a civil action filed by the plaintiffs, John and Farrah Lynn, against defendant Shenitha Wilson, a social worker employed with the Calhoun County Department of Human Resources ("DHR").  (Doc. 22).  Wilson is sued in her individual capacity under 42 U.S.C. § 1983 for allegedly violating the plaintiffs' due process rights under the Fourteenth Amendment of the United States Constitution.  (Doc. 22 at 16, 18, 20) (Counts One, Two, and Three).  The plaintiffs also sue the defendant for negligence (Count Four) and wantonness (Count Five).  (Doc. 22 at 24, 26).  All counts arise out of Wilson's actions as a social worker which ultimately led to the removal of the plaintiffs' child from their home.

This case comes before the court on the defendant's "Second Motion to

Dismiss" the Amended Complaint. (Doc. 23).[1] The motion claims that this court lacks subject matter jurisdiction over this action and, therefore, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, this case should be dismissed. The motion also claims that this case should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. For the reasons stated herein, the motion will be **GRANTED**.

## I.    STANDARD OF REVIEW

### A.    <u>Rule 12(b)(1)</u>

Unlike state courts, federal tribunals are bodies of limited jurisdiction, meaning that the grounds for the court's jurisdiction over the claims asserted by the plaintiff must be present at the time the complaint is filed and must be obvious on the face of the complaint. Fed. R. Civ. P. 8(a); 28 U.S.C. § 1330, *et seq.* The law is clear that Plaintiffs, the parties seeking to invoke federal jurisdiction in this case, have the burden to demonstrate that the court has subject matter jurisdiction. *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S. Ct. 780, 785, 80 L. Ed. 1135 (1936) ("They are conditions which must be met by the party who seeks the exercise of jurisdiction in his favor . . . . [and a]s he is seeking relief subject to this

---

[1]  The defendant's first motion to dismiss was denied without prejudice when this court determined that the original complaint (doc. 1) was "a quintessential shotgun pleading" (doc. 20 at 3) (internal quotations and citations omitted) and ordered the plaintiffs to replead.

supervision, it follows that he must carry throughout the litigation the burden of showing that he is properly in court."); *see also McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002) (per curiam) ("[T]he party invoking the court's jurisdiction bears the burden of proving, by a preponderance of the evidence, facts supporting the existence of federal jurisdiction.").

Further, lack of subject matter jurisdiction cannot be waived or expanded by judicial interpretation, and a jurisdictional deficiency can be raised at any time by either the parties or the court. *See, e.g., Am. Fire & Cas. Co. v. Finn*, 341 U.S. 6, 17-18, 71 S. Ct. 534, 542,  95 L. Ed. 702 (1951) ("The jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation or by prior action or consent of the parties."); *Sosna v. Iowa*, 419 U.S. 393, 398, 95 S. Ct. 553, 557, 42 L. Ed. 2d 532 (1975) ("While the parties may be permitted to waive nonjurisdictional defects, they may not by stipulation invoke the judicial power of the United States in litigation which does not present an actual 'case or controversy,' and . . . we feel obliged to address the question of mootness before reaching the merits of appellant's claim.") (citation omitted).

### B.     Rule 12(b)(6)

A Rule 12(b)(6) motion attacks the legal sufficiency of the complaint. *See* Fed. R. Civ. P. 12(b)(6) ("[A] party may assert the following defenses by motion:  (6)

failure to state a claim upon which relief can be granted[.]"). The Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957) (footnote omitted) (quoting Fed. R. Civ. P. 8(a)(2)), *abrogated by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007); *see also* Fed. R. Civ. P. 8(a) (setting forth general pleading requirements for a complaint including providing "a short and plain statement of the claim showing that the pleader is entitled to relief").

While a plaintiff must provide the grounds of his entitlement to relief, Rule 8 does not mandate the inclusion of "detailed factual allegations" within a complaint. *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964 (quoting *Conley*, 355 U.S. at 47, 78 S. Ct. at 103). However, at the same time, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563, 127 S. Ct. at 1969.

"[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the

assumption of truth." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine <u>whether they plausibly give rise to an entitlement to relief</u>." *Id.* (emphasis added). "Under *Twombly*'s construction of Rule 8 . . . [a plaintiff's] complaint [must] 'nudge[] [any] claims' . . . 'across the line from conceivable to plausible.' *Ibid.*" *Iqbal*, 556 U.S. at 680, 129 S. Ct. at 1950-51.

A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).

## II.   FACTUAL ALLEGATIONS

The following factual allegations appear in the Amended Complaint:

6.      On or about July 25, 2014 the Plaintiffs' newborn son, Oliver Lynn, was admitted to Children's Hospital due to birth complications. While at Children's Hospital, Oliver Lynn received medical treatment including surgery to address an imperforate anus. The Plaintiffs were guided and provided instruction on the care-giving requirements for Oliver Lynn.

7.      During the Children's Hospital admission, the Calhoun County Department of Human Resources was contacted by an employee of Children's Hospital expressing a potential concern regarding Plaintiffs' capacity to manage the needs of their son. DHR received the contact and directed Defendant Shenitha Wilson to make contact with the hospital and Plaintiffs.

8.      Based on the information obtained from the Plaintiffs and Children's Hospital staff, DHR requested records from the State of Ohio regarding the Plaintiffs' history. Ohio officials provided records on or about August 7, 2014.

9.      On or about August 7, 2014 Defendant Shenitha Wilson contacted Garrett Counseling and requested services to be provided to the Plaintiffs upon their son's discharge from Children's Hospital. On this day, Defendant Shenitha Wilson also contacted psychologist Dennis Sizelove regarding conducting psychological evaluation or assessments of the Plaintiffs.

10.     On or about August 11, 2014 Oliver was discharged to the care of Plaintiffs. Defendant Shenitha Wilson approved Oliver's discharge home to the Plaintiffs.

. . .

12.     Defendant Shenitha Wilson was contacted by the Plaintiffs upon Oliver's discharge and on or about August 12, 2014 Defendant Wilson made a home visit to the Plaintiffs. During the home visit Defendant Wilson requested Plaintiffs cooperate in submitting to a psychological assessment. During this visit, Defendant Wilson toured the home and observed the circumstances and care being provided to Oliver by his parents.

13.     On or about August 13, 2014 Dennis Sizelove, pursuant to the Wilson request, purportedly conducted, in the Calhoun County Department of Human Resources offices located in Anniston, Calhoun County, Alabama, a pre-evaluation interview with the Plaintiffs and

purportedly administered the Mental Status Exam (MSE) and the Kaufman Brief Intelligence Test, Second Edition (KBIT-2)

14.    On or about August 15, 2014 Leah Simmons, an employee of Garrett Counseling began in-home sessions with the Plaintiffs. Ms. Simmons did not note or communicate to DHR any concerns regarding the care of Oliver.

15.    Dennis Sizelove prepared Psychological Evaluation Reports purportedly relating to the Plaintiffs, and on or about August 26, 2014 submitted the reports to DHR.

16.    According to the report prepared on Plaintiff John Lynn,

"… DHR is requesting testing to assess his parenting skills as well as his cognitive level of functioning. The stated reason for the referral is to assess the client for the presence of psychopathology, to assess his IQ, and to evaluate whether he is capable of providing appropriate parenting for this child."

17.    According to the report prepared on Plaintiff Farrah Mason Lynn:

"Testing is requested to assess the client's level of functioning and her current ability to parent her infant child. The stated reason for the referral is to assess the client for the presence of psychopathology, to assess her IQ, and to evaluate whether she is able to provide appropriate parenting for her children."

18.    Dennis Sizelove stated in his report on John Lynn:

"Intellectually he may be capable of engaging in activities of daily living required to provide appropriate parenting for his child with some assistance due to his self-reported inability to read. This assessment of his parenting abilities is considered accurate during times when the client is not

engaged in seeking substances, actively abusing substances, or recovering from the effects of said substances."

Sizelove further opines and recommends:

"In regard to the placement of his children, it is the clinical opinion of this evaluator that the client is currently unable to appropriately care for his child both physically and emotionally without supervision. . . . His deficits in occupational, social, and emotional functioning put the client and his children at risk of harm. It is this examiners clinical opinion that until the client can demonstrate that he is abstinent from substance abuse, is financially stable, and is able to provide a stable, safe, and appropriate home environment for his child he is to remain out of the client's custody or as an alternative supervision should be provided along with parenting education to ensure that the client understands, and can provide appropriate parenting. Only at such time as he can demonstrate that he is able to provide for his child in the above manner should he be considered as an appropriate parent for this child."

19.    Dennis Sizelove stated in his report on Plaintiff Farrah Mason Lynn:

"Given that there was a significant difference between her verbal and nonverbal scores, the client may be less competent at tasks that require her to utilize skills that are verbal than she is at tasks that require nonverbal fluency (such as solving puzzles, doing piece work). She may be capable of providing appropriate care for her child with supervision and may be intellectually capable of engaging in treatment for substance abuse and any other mental disorders by which she may be impacted as long as any materials are presented orally as the client reported she is unable to read or write anything other than her name. This

assessment of her parenting abilities is considered accurate during times when the client is not engaged in seeking substances, actively abusing substances, or recovering from the effects of said substances."

Sizelove further opines and recommends:

"In regard to the placement of her children it is the clinical opinion of this evaluator that the client is currently unable to appropriately care for her children without supervision both physically and emotionally. . . . Her deficits in occupational, social, and emotional functioning put the client and her children at risk of harm. It is this examiners opinion that until the client can demonstrate that she is abstinent from substance abuse, has secured stable housing independently of her spouse's family, and is able to provide a stable, safe and appropriate home environment for her children they are to remain out of the client's custody. Only at such time as she can demonstrate that she is able to provide for her children in the above manner should she be considered as an appropriate parent for them."

20.    Plaintiffs are literate and are absent of any issues regarding substances or substance abuse. Plaintiffs were financially stable and had stable housing. Dennis Sizelove engaged in no diagnostic protocol to identify or assess deficits in the occupational, social, or emotional functioning of either Plaintiff. Sizelove failed to base his opinions on information and techniques sufficient to substantiate his findings and failed to conduct an examination of the Plaintiffs adequate to support his statements and conclusions. Much of the information and assessment provided by Sizelove to DHR in general, and therefore to Defendant Wilson in particular, was known to the Defendant to be incorrect.

21.    On August 28, 2014 Leah Simmons conducted another in-home session with the Plaintiffs. Ms. Simmons did not note nor communicate to DHR any concerns regarding the care of Oliver.

22.    Garrett Counseling submitted to DHR billing and notes. Nothing in the notes reported or indicated any concerns regarding the care of Oliver Lynn.

23.    Plaintiffs provided care to their infant son, Oliver Lynn, with Defendant Shenitha Wilson's knowledge and approval until September 10, 2014.

24.    Between August 15, 2014 and September 10, 2014 Defendant Wilson again visited the home of Plaintiffs and observed the care being provided to Oliver. At the time of the visit there existed no imminent danger to the life or health of Oliver Lynn and Wilson did not remove Oliver from the Plaintiffs.

25.    On September 10, 2014 at approximately 5:30 p.m. Defendant Shenitha Wilson contacted the Anniston Police Department and requested officers accompany her to the home of the Plaintiffs. Upon arrival at Plaintiffs' home Defendant Wilson physically removed Oliver Lynn from the residence and from the care and custody of Plaintiffs. Defendant Wilson had not requested nor possessed a "pick-up order" and Defendant Wilson had no information, reports, evidence or any personal observation indicating the residence or the care and custody of the parents presented an imminent danger to Oliver's life or health.

26.    . . . Neither the residence nor the caregivers to Oliver Lynn presented imminent danger to his life or health. Upon taking Oliver Lynn into protective custody Shenitha Wilson willfully and intentionally failed to immediately notify the Calhoun County Juvenile Court [as she was required by law to do]. Ms. Wilson, willfully and intentionally, failed to give the Plaintiffs or the Juvenile Court Intake Officer written notice of the action or the reasons for such action[, which she was required by law to do].

27.    On September 11, 2014, Defendant Shenitha Wilson filed a complaint alleging the dependency of Oliver Lynn in the Calhoun County Juvenile Court citing the Sizelove reports and specifically stating, inter alia,

> "The psychologist clinical opinion is that the clients are currently unable to appropriately care for their children without supervision both physically and emotionally. The psychologist reports that both parents' deficit in occupational, social and emotional functioning put the client and their children at risk of harm."

28.    At the time of Oliver's summary removal and at the time of the Complaint's filing with the Juvenile Court Intake Officer, Defendant Shenitha Wilson was fully aware there existed no imminent danger to the life or health of Oliver Lynn. Wilson was also fully knowledgeable that Oliver had been in the sole care of Plaintiffs and that Oliver was not only being appropriately cared for but that he was thriving.

29.    The Juvenile Court Intake Officer, pursuant to the practices established by Calhoun County Department of Human Resources and at the insistence of Defendant Shenitha Wilson and while ignoring statutory prescriptions, presented the Wilson Complaint and Petition alleging dependency directly to the Juvenile Court, by-passing the Calhoun County Circuit Clerk. A shelter care hearing was set for approximately four to five hours from the filing of the Complaint.

. . .

31.    At the shelter care or 72 hour hearing, although not a hearing on the merits of the Petition, Plaintiffs were to be afforded an opportunity to admit or deny the allegations of the Petition. §12-15-308(c), Code of Alabama. The Plaintiffs were not given that opportunity by the Calhoun County Juvenile Court. Instead, at the beginning of the hearing Wilson through counsel, informed the Court that an agreement had been reached. The agreement did not include an acknowledgment by the Plaintiffs as to the merits of the Petition, or the propriety of summary removal of their son by Wilson. The agreement provided for the State to maintain temporary custody of Oliver, to have discretion in planning and placement and to work reunification with the parents. The Court did not give Plaintiffs an opportunity to admit or deny the allegations of the Petition nor did the court provide Plaintiffs an opportunity to present or

address any claims regarding violation of their constitutional rights by Wilson. The Court did inquire of Plaintiffs' appointed counsel whether this was the agreement and received an affirmative response. The Court took no evidence in support of the Petition nor did the Court hear or have before it clear and convincing evidence that Oliver had ["]no parent, legal guardian, legal custodian, or other suitable person able to provide supervision and care for the child … or [t]he release of Oliver would present serious threat of substantial harm to him["] as mandated by §12-15-128 (a)1) and (a)(3) and §12-15-128(b), Code of Alabama.

32.     In discussion prior to formal commencement of the hearing Wilson, directly and through counsel, repeatedly represented to Plaintiffs' appointed counsel that Sizelove determined Plaintiffs could not safely care for their child. Prior to and at the hearing, counsel for the Plaintiffs and the guardian ad litem requested from Defendant Shenitha Wilson the Sizelove psychological reports utilized as the basis and premise of the filing of the dependency complaint and petition and as the basis of Wilson's statement that Sizelove determined Plaintiffs could not safely care for their child. Defendant Wilson refused to provide a copy or to allow inspection of the reports. Without access to the reports and having to rely on the Wilson representations Plaintiffs were without recourse to challenge the reports or the representations and succumbed to the agreement for DHR to maintain custody pending further hearing.

33.     Notwithstanding Wilson's knowledge that the Sizelove reports had been known to her for two weeks; that the reports contained obvious material inaccuracies; that Oliver was thriving in his parents care; that Garrett Counseling reported no issues; that Wilson had allowed Oliver to remain in the Plaintiffs care since receiving the reports, Wilson willfully,  intentionally and fraudulently withheld from the Plaintiffs, their appointed counsel and the Court this dispositive evidence which was contrary to the allegations set forth in the Complaint.

34.     Based on Wilson's willful and intentional concealment of the true facts and the forced agreement the Court directed Oliver to remain in the custody of DHR and made other findings contrary to what Wilson knew to be true. The Court set the merits of the Petition to be heard on

October 15, 2014. The Court did not enter a final ruling or conclusive judgment on the merits of Wilson's Petition.

35.     Subsequent to the shelter care hearing Defendant Wilson refused contact between Plaintiffs and their infant son Oliver except for one hour of supervised visits per week at the Calhoun County DHR offices.

36.     Oliver Lynn was placed in a foster home and died while in the custody of the Calhoun County Department of Human Resources on October 14, 2014.

(Doc. 22 at 2-13).

The complete allegation of dependency, as stated in Wilson's Petition, attached as Exhibit A to the Motion to Dismiss (doc. 23-1), is as follows:[2]

_____

[2] It has been noted that

[a] court evaluating a motion to dismiss for failure to state a claim upon which relief can be granted must focus its analysis on the face of the complaint, but it may also consider any attachments to the complaint, matters of public record, orders, and items appearing in the record. *See Watson v. Bally Mfg. Corp.*, 844 F.Supp. 1533, 1535 n. 1 (S.D.Fla.1993), *aff'd mem.*, 84 F.3d 438 (11th Cir.1996). Additionally, any documents referenced in the complaint that are central to the plaintiff's case may be considered. *See In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1335 (S.D.Fla.1999).

*Clark v. Bibb Cnty. Bd. of Educ.*, 174 F. Supp. 2d 1369, 1370-71 (M.D. Ga. 2001).  The same standards apply in a Rule 12(b)(1) facial challenge to this court's jurisdiction.  *U.S. ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-CV-58, 2014 WL 7272598, at *24 (S.D. Ga. Dec. 18, 2014) (BuBose, J.); *see also,* SunSouth Bank v. First NBC Bank, No. 1:13-CV-379-WKW, 2014 WL 3767548, at *1 (M.D. Ala. July 31, 2014) (Watkins, J.) ("This is a facial attack because Defendants rely entirely on the substance of the complaint, documents referenced in the complaint, and inferences from the allegations in the complaint.").  The petition and order are referenced in, and are certainly central to, the plaintiffs' claims in this case.  They are properly considered.  In addition, "factual attacks" to this court's jurisdiction under Rule 12(b)(1) challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings . . . are considered."  *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).

The child's dependency has been evidenced by the following facts: O.L. was born on 7/25/14 to J. and F. L. O.L. was born with an imperforate anus. Through surgical procedure an anorectal pull was completed on O.L. on 7/30/2014. Due to his medical condition, O.L. needs follow up care to ensure full recovery. The mother, F.M.L. has extensive CPS history in Cincinnati, Ohio and previously lost custody of five children in the State of Ohio due to neglect, abuse and poor parenting skills. J.L. reports that one of the five children was his child. These children remain in the custody of relatives and friends in Ohio. The CPS cases in Ohio were closed in 2012. F.L. and J.L. were married in Jefferson County Alabama just prior to O.L. being born. The L,'s have resided in Alabama for approximately 11 months. It was also noted that Ms. L. appeared to be low functioning. A Psychological Evaluation referral was made by Calhoun County DHR and the results are as follows: **The psychologist's clinical opinion is that the clients are currently unable to appropriately care for their children without supervision both physically and emotionally.** Mrs. L. is diagnosed with an AXIS I Diagnosis of Borderline Intellectual Functioning. Mr. L. has a basic misunderstanding of the serious nature of his son's birth defect. **The Psychologist reports that both the parents' deficit in occupational, social and emotional functioning put the client and their children at risk of harm.** The parents are allegedly residing with Ms. L.'s sister and her husband. However, when the DHR social worker went to the home today, Mrs. L was found to be alone with the baby. All these factors combined place O.L. at great risk with the parents.

(Doc. 23-1 at 2-3) (bold indicates portion of the petition quoted, without noting missing portions with an ellipsis, in the Amended Complaint (see doc. 22 at 9, ¶27)).

The shelter care order issued by the state court provides, in pertinent part:

The Court, having considered the agreement [of the parties] . . . finds in accordance with the requirements of Public Laws § 96-272 & 105-89 <u>and Alabama Code 1975</u>, Title 12-15-312 as follows:

That placement of the child in his/her home would be contrary to

the best interests and welfare of the child and that placement out of the home was in the best interest of the health and safety of the child at the time of removal.

That an emergency situation exists which requires the immediate temporary removal of the child from his/her home and that it is reasonable not to make efforts to prevent removal of the child form his/her home due to the emergency situation or pursuant to Public Law 105-89.

That reasonable efforts will be made to reunite the child and his/her parent(s).

Custody of the child is transferred to the Department of Human Resources, pendente lite, with the Department having discretion in planning and placement.  The Department shall notify the GAL of any change in the placement of a child by the end of the next business day.  A hearing will be scheduled on said change of placement upon the motion of any party.  The Department shall have authority to allow for out of state travel and consent for the child to receive medical care to maintain and foster the good health and welfare of the child.

(Doc. 23-1 at 6).  The order also reflects on its face that the plaintiffs in this case were

represented at the shelter care hearing by retained counsel <u>and</u> also each by their own

separate, court appointed, guardians ad litem.  (Doc. 23-1 at 6).  The minor child also

had his own guardian ad litem.  (Doc. 23-1 at 6).

## III.   ANALYSIS

This court must consider first whether it has subject matter jurisdiction over

this case.  *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir.2001) (stating

that where "a Rule 12(b)(1) motion is filed in conjunction with other Rule 12

motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.") (*citing Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir.1977)).[3]  The instant case is barred by the *Rooker-Feldman* doctrine.[4]

## A.   The *Rooker-Feldman* Doctrine

In its most recent discussion of the *Rooker-Feldman* doctrine, the Eleventh Circuit stated:

> Application of *Rooker–Feldman* is a threshold jurisdictional matter. *Brown v. R.J. Reynolds Tobacco Co.*, 611 F.3d 1324, 1330 (11th Cir.2010). . . . The party invoking subject matter jurisdiction bears the burden of proving its existence. *See Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir.2005). . . . Alone among the federal courts, only the Supreme Court may exercise appellate authority to reverse or modify a state-court judgment. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284–85 (2005). Accordingly, under the *Rooker–Feldman* doctrine, federal district courts and courts of appeals lack jurisdiction to review the final judgment of a state court. *Lozman*, 713 F.3d at 1072. However, in delineating the boundaries of *Rooker–Feldman*, the Supreme Court has clarified that the doctrine is narrow in scope, and only applies to cases that are "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp.*, 544 U.S. at 284; *see also Lozman*, 713 F.3d at 1072.

---

[3]  *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

[4]  "The *Rooker-Feldman* doctrine derives from *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983)." *Alvarez v. Attorney General for Fla.*, 679 F.3d 1257, 1262 (11th Cir. 2012).

*Rooker–Feldman* applies "both to federal claims raised in the state court and to those 'inextricably intertwined' with the state court's judgment." *Casale v. Tillman*, 558 F.3d 1258, 1260 (11th Cir.2009). It does not apply if a party lacked a reasonable opportunity to raise his federal claim in state court. *Id.* A claim filed in federal court is inextricably intertwined with a state court judgment if it would "effectively nullify" the state court judgment or if it "succeeds only to the extent that the state court wrongly decided the issues." *Id.* (quotation omitted). The pendency of an action in state court precludes application of *Rooker–Feldman*. *Exxon Mobil Corp.*, 544 U.S. at 292.   Thus, *Rooker–Feldman* does not apply if the federal action was commenced before the end of state proceedings. *Nicholson v. Shafe*, 558 F.3d 1266, 1274 (11th Cir.2009). State proceedings end for *Rooker–Feldman* purposes in three scenarios:(1) when the highest state court in which review is available has affirmed the judgment below and nothing is left to be resolved, (2) if the state action has reached a point where neither party seeks further action, and (3) if the state court proceedings have finally resolved all the federal questions in the litigation, but state law or purely factual questions (whether great or small) remain to be litigated. *Id.* at 1275 (quotation omitted).

*Cavero v. One W. Bank FSB*, No. 14-14369, 2015 WL 3540388, at *1-2 (11th Cir. June 8, 2015).[5]  In the instant case all of the federal claims fall squarely within the

---

[5]  In their brief, the plaintiffs refer to the "four-factor test" that at one time was used by the Eleventh Circuit in applying the *Rooker-Feldman* doctrine.  (Doc. 24 at 14).  In *Nicholson v. Shafe*, 558 F.3d 1266, 1272 (11th Cir. 2009), the Eleventh Circuit noted the factors as:

(1) the party in federal court is the same as the party in state court, (2) the prior state court ruling was a final or conclusive judgment on the merits, (3) the party seeking relief in federal court had a reasonable opportunity to raise its federal claims in the state court proceeding, and (4) the issue before the federal court was either adjudicated by the state court or was inextricably intertwined with the state court's judgment[.]

*Nicholson*, 558 F.3d at 1272 (*quoting Amos v. Glynn County Bd. of Tax Assessors*, 347 F.3d 1249, 1266 n. 11 (11th Cir.2003)).  However, in that same opinion, the court noted the Supreme Court's decision in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 125 S.Ct.

parameters of the *Rooker-Feldman* doctrine.

1.   ***The Plaintiffs Are State-Court Losers Complaining of Injuries Caused by State-Court Judgments Rendered before the District Court Proceedings Commenced***

It is clear that the dependency proceedings had "reached a point where neither party [sought] further action."  The Shelter Care hearing ended, <u>by agreement of all parties,</u> all of whom were represented by counsel, when the state court judge entered

---

1517, 161 L.Ed.2d 454 (2005), and wrote:

> *Exxon Mobil* clarified the scope of the *Rooker–Feldman* doctrine by returning it to its roots, the facts of the *Rooker* and *Feldman* cases. In doing so, *Exxon Mobil* casts doubt on the continued viability of the *Amos* test. *See United States v. Mendez*, 528 F.3d 811, 817 n. 3 (11th Cir.2008) ("When a prior panel decision conflicts with a subsequent Supreme Court decision, we must depart from the prior panel precedent and follow the Supreme Court decision."). Rather than apply *Amos*, we adhere to the language in *Exxon Mobil*, delineating the boundaries of the *Rooker–Feldman* doctrine: "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil*, 544 U.S. at 284, 125 S.Ct. 1517.

*Id.* at 1274; *see also, Arthur v. JP Morgan Chase Bank, NA,* 569 F. App'x 669, 675 (11th Cir. 2014) (district court erred in applying *Amos* test as that test has been abandoned in favor of strict reliance on the language found in *Exxon Mobil*); *Velazquez v. S. Florida Fed. Credit Union,* 546 F. App'x 854, 856 (11th Cir. 2013) (holding that, since *Exxon,* the *Amos* factors are not applied); *Cormier v. Horkan*, 397 F. App'x 550, 552 (11th Cir. 2010) (holding that, since *Exxon,* the *Amos* factors are not applied); *Lomax v. Ruvin*, 387 F. App'x 930, 931 (11th Cir. 2010) *Rooker–Feldman* doctrine should be applied only within the limits set by *Exxon*).  The plaintiffs correctly state that this court's order of February 20, 2015 (doc. 20 at 4) also, albeit erroneously, sets forth the four part test in a footnote, while at the same time setting out the standard from *Exxon Mobil*.  Importantly, the court's February 20, 2015, order had nothing to do with the *Rooker-Feldman* doctrine.  Rather, that order discussed the shotgun nature of the plaintiffs' complaint.  The purpose of the note at issue was to explain why the plaintiffs needed to provide more specificity, not to establish the law of the case.  The plaintiffs had no basis to rely on the court's footnote in that order.  Their reliance is especially misplaced in light of the fact that the defendant quotes *Exxon Mobile* at length in her brief.

18

the order of shelter care. (Doc. 23-1). There is no indication in the record, or indeed even any allegation, that any party was seeking any further action. The plaintiffs, having lost custody of the child, were the state court losers.[6] This case was filed only after the state court judgment was entered.[7]

---

[6] As noted previously, the plaintiffs' arguments are all directed towards the wrong standard. Still, they assert that the hearing "[was] not a review of the removal's merits, nor a determination of the propriety of the removal. Rather it [was] for the sole purpose of determining whether continued shelter care [was] required . . . pending a hearing on the merits of Wilson's Dependency Petition." (Doc. 24 at 16). "Shelter Care" is "[t]he temporary care of children in group homes, foster care, relative placement, or other nonpenal facilities." Ala. Code § 12-15-102(25). The procedures for the hearing are set out in Ala. Code 12-15-308, and include provisions requiring that the hearing be held "within 72 hours from the time of removal . . . to determine whether continued shelter care is required." Ala. Code 12-15-308(a). In this case, however, the order entered by the state court clearly states that the court finds "[t]hat placement of the child in his/her home would be contrary to the best interests and welfare of the child and that placement out of the home was in the best interest of the health and safety of the child <u>at the time of removal</u>," and "[t]hat an emergency situation exists <u>which requires the immediate temporary removal of the child from his/her home and that it is reasonable not to make efforts to prevent removal of the child form his/her home due to the emergency situation</u>." (Doc. 23-1 at 6) (emphasis added). Further, the instant order clearly transferred custody of the child to DHR. (Doc. 23-1 at 6 ("[c]ustody of the child is transferred to . . . [DHR]")). Because there were no further proceedings, for all intents and purposes this was also a final custody termination. The plaintiffs were on the losing end of that decree. If, for some reason, the juvenile court was without authority to enter that custody order, the plaintiffs should have made that argument on appeal, not to this court.

[7] The plaintiffs argue, without citing any authority, that "none of [their] claims in any form were before the Calhoun County Juvenile Court[,] therefore there has never been a final or conclusive judgment on their merits." (Doc. 24 at 15). The plaintiffs' argument confuses the issue of whether the state court's judgment was a final judgment on the merits, with whether the issues therein were "inetrixably intertwined," with those in the instant case. No future court dates were set, but the court provided that "[a] hearing will be scheduled on [any] change of placement upon the motion of any party." (Doc. 23-1 at 6). For *Rooker-Feldman* purposes, the state court order was a final judgment on the merits. The plaintiffs cite no authority to the contrary.

### 2.    *The Claims in the Instant Case Are "Inextricably Intertwined" with the State Court's Judgment*[8]

The most instructive case on this issue is *Goodman ex rel. Goodman v. Sipos*, 259 F.3d 1327, 1328-30 (11th Cir. 2001).[9]  That case

---

[8]  The plaintiffs make no real argument on this issue.  Instead the focus only on the "summary removal," writing:

> Wilson pins her hopes on the notion that the shelter care hearing Order, attached to her Motion to Dismiss as Exhibit "B" ratifies her acts and conduct.  It does not.  However, at this stage of the litigation the shelter care Order it irrelevant and is due to be excluded.  (Rule 12(d) and 12(f) Fed. R. Civ. P.)

(Doc. 24 at 17).  As discussed previously (see supra note 2), the plaintiffs are incorrect.  The plaintiffs also state:

> Although due to be excluded and not considered, for sake of clarity, the shelter care Order, attached to Wilson's Motion as Exhibit "B" does not state or render as a finding that Wilson acted in compliance with the due process rights of the Plaintiffs or that the summary removal of Oliver Lynn was effectuated pursuant to a determination that the residence of the child or the caregiver presented imminent danger to Oliver Lynn's life, as required by state law.(§26-14-6 Code of  Alabama)[.] Furthermore, Wilson is factually inaccurate when she represents to this Court that the Plaintiffs agreed to the findings of fact. (Wilson Motion pg. 25 ¶1)[.] The Plaintiffs did not agree that Wilson properly removed Oliver. Nor did Plaintiffs agree that an emergency situation existed requiring immediate temporary removal as asserted in Wilson's Motion. (Wilson Motion pg. 30).

(Doc. 24 at 17-18).  First, as noted above, the state court order need not explicitly state, or even decide <u>anything</u> with regard to the plaintiffs' due process rights for them to be "inextricably intertwined" with the state court's judgment.   The remainder of the allegations in this paragraph stretch credulity when one considers the clear language of the order, and the fact that the order, on its face, states that it is based on the agreement of the parties, each of whom were represented by an attorney, and their own, separate guardians ad litem.  Regardless, even if somehow this order was entered contrary to Alabama law, or was entered contrary to the plaintiffs' agreement, the proper place to make that argument is on appeal to an <u>Alabama appellate court</u>, not here.

[9]  Although this case is pre-*Exxon Mobil* the court cites it only for its interpretation of "inextricably intertwined" in the context of child custody proceedings.   *See, Velazquez v. S.*

[arose] out of an investigation of child neglect conducted by [the Georgia Department of Family and Children Services ("DFCS")] against Goodman. Defendant D'Anna Liber was the Supervisor of the Child Services Investigation Section of the Cobb County DFCS Office in 1995 when this investigation took place. On October 27, 1995, Liber received a call from school personnel informing her of a report from one of Goodman's neighbors that Goodman left Michael, age 13 at the time, at home alone all day from 7 a.m. until 10 or 11 p.m., and that Michael asked neighbors for food. The school official further informed Liber that Goodman had previously withdrawn Michael from school, indicating that she would home-school him.

In response to this report, a caseworker visited Goodman's home and reported that Michael was barefoot, and that he admitted he was at home alone four days a week until after 10:30 p.m. while his mother worked and went to school. He indicated that they had more food now that his mother was working. Goodman later called Liber and stated that she was complying with home-schooling regulations, but she refused to meet with any DFCS officials.

On November 9, 1995, Liber received an anonymous call from a neighbor of Goodman. The neighbor again stated that Michael was at home alone, both during the day and at night. About two weeks later, DFCS received a third report from another neighbor stating similar concerns. The person making the third report stated that Michael begged for food, was not clean, walked barefoot in a yard with 20 chickens, and lived in a house with about 50 birds. That person also said he and other neighbors were concerned about Michael and that Goodman was "a little crazy." Liber assigned Defendant Patty Sipos, a DFCS caseworker, to investigate the reports.

---

*Florida Fed. Credit Union*, 546 F. App'x 854, 857 (11th Cir. 2013) (in determining whether *Exxon Mobil* standard is satisfied, "this court has continued to apply the fourth factor of the *Amos* test, evaluating whether the plaintiff's claims are 'inextricably intertwined' with the state court judgment.").

After being assigned to the case, Sipos went to Goodman's house and knocked on the door, but no one answered. Sipos called Liber and informed her of this, and Liber decided that police involvement was necessary. Liber called the child abuse unit of the Cobb County Police Department and informed them of the situation, and two uniformed officers were sent to the house to meet Sipos. Officers Forrester and Crook came to the house, discussed the situation with Sipos, and then knocked on the door. The subsequent events are in dispute.

According to Michael, Officer Forrester opened the unlocked door and stood at the threshold with Sipos behind him. According to the defendants, the officers explained to Michael why they were there, and asked him to call his mother so that they could meet with her. After several minutes of discussion and unsuccessful attempts to reach Goodman, the defendants state that Michael opened the door wide and gestured for the officers and Sipos to enter. Goodman and Michael deny that he consented (or had authority to consent) for the officers or Sipos to enter.

Sipos states that her purpose in entering was to determine whether the house posed a health hazard to Michael (because of the report of birds) and to determine whether there was food for him. According to the defendants, Sipos and the officers quickly walked through the house, while Michael laughed and joked with the officers. Sipos and the officers departed after Sipos concluded that the house was not a health risk and that there was food.

Sipos returned later in the day in an attempt to speak with Goodman, but no one was home. She then returned the next day and spoke with a neighbor who expressed concerns about Michael's being at home alone all day and his begging for food. Sipos later called Goodman at work after getting no answer at home, but Goodman hung up on her.

On December 5, 1995, a confidential source claiming to be a long-time friend of  Goodman reported to Sipos that Goodman had threatened to shoot herself and Michael. The caller said that Goodman

was acting bizarre, and had said that she had a gun. The caller seemed to Sipos to be reliable. Thereafter, Sipos spoke with Robert Grayson, an attorney for DFCS, about the situation. Grayson spoke with the confidential source and concluded based on that conversation that there was sufficient evidence to seek an ex parte order taking custody of Michael away from Goodman.

The next day, DFCS filed an ex parte petition, supported by an affidavit from Sipos, seeking to obtain custody of Michael. The petition and supporting affidavit stated that Michael was deprived because his mother had withdrawn him from school without complying with home school requirements. They indicated that DFCS had received several reports of Michael being home alone all day, and a report that Goodman had threatened to shoot herself and Michael. Finally, the petition and affidavit stated that Goodman had been uncooperative with DFCS during its investigation, and that Michael should be removed from his mother's custody for his own safety. Goodman alleges that Sipos' affidavit filed in support of the petition for custody was intentionally or recklessly false.

After reviewing DFCS' ex parte petition, the Cobb County juvenile court issued an order taking custody away from Goodman and setting a hearing for the following day. Michael was then picked up by the sheriff's department.

The following day, the juvenile court held a hearing which Goodman attended. The court found probable cause to grant DFCS custody of Michael, and DFCS and Goodman agreed that Michael would be placed with a family friend, Curtis Scott. A few days later, DFCS took Michael away from Scott, however, because Sipos claimed that Scott had deprived her of access to Michael. According to Goodman, Sipos threatened to have Scott arrested if he did not return Michael. At that time Michael was placed in a shelter. Goodman filed a motion with the juvenile court to have Michael returned to Scott's custody, but after a hearing the court denied her motion. The parties eventually agreed that Robert Goodman, Michael's father, would be granted temporary custody of him. On April 12, 1996, the juvenile court

23

entered an order requiring that Michael remain in his father's custody for up to two years.

*Goodman*, 259 F.3d at 1328-30.

In their complaint to the federal district court, the plaintiffs raised

three § 1983 claims that are based on allegations of separate constitutional violations. First, they allege[d] that Liber, Sipos and Officer Forrester violated their Fourth Amendment rights by unlawfully entering and searching Goodman's house without a warrant or consent. Second, the plaintiffs challenge the veracity of the affidavit submitted by Sipos to the juvenile court in support of the ex parte petition for custody of Michael, and argue that it and the ensuing ex parte proceeding violated the Due Process Clause of the Fourteenth Amendment. Finally, the plaintiffs allege that the defendants committed an additional due process violation by threatening Scott with arrest if he did not return Michael to DFCS

*Id.* at 1330.  The Eleventh Circuit applied *Rooker-Feldman* in part, writing:

The plaintiffs did not, strictly speaking, present any of the three federal claims asserted in their complaint in this case to the state court which considered the issues involving Michael's custody. We must decide whether the plaintiffs' federal claims nonetheless were "inextricably intertwined" with the state court judgment in the sense that "the federal claim[s] succeed[ ] only to the extent that the state court wrongly decided the issues before it," *Siegel,* 234 F.3d at 1172, and, if so, whether the plaintiffs had a reasonable opportunity to present their federal claims in the state court proceedings, *see Powell,* 80 F.3d at 467.

On two occasions we have considered and applied the *Rooker–Feldman* doctrine in cases involving claims related to state child custody proceedings. *See Liedel v. Juvenile Court of Madison County, Ala.,* 891 F.2d 1542 (11th Cir.1990); *Staley v. Ledbetter*, 837 F.2d 1016 (11th Cir.1988). In *Staley,* we held that the *Rooker–Feldman* doctrine deprived the district court and this Court of jurisdiction over a plaintiff's

§ 1983 claim in which "[s]he requested reinstatement of parental custody and psychiatric care at state expense for her children and herself" based on alleged violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment. 837 F.2d at 1017. We stated that the plaintiff "in essence sought to reverse a state court's child custody determination" and held that:

> [N]o federal subject matter jurisdiction existed in this case. In effect, Staley seeks to challenge collaterally the state agency and court proceedings that terminated her parental rights. The federal courts are not a forum for appealing state court decisions.

*Id.* at 1017–18.

Similarly, in *Liedel* parents who were displeased with a state court's child custody action brought a § 1983 action seeking "a temporary restraining order and a permanent injunction against the Department [of Human Resources] and Juvenile Court, preventing them from enforcing the Juvenile Court's prior orders and preventing them from issuing further orders against the [plaintiffs]." 891 F.2d at 1544. We reasoned that the requested relief "would effectively nullify those state orders," and therefore held that "[t]o the extent that the [plaintiffs'] federal court complaint seeks to challenge the final state court judgment, it must be dismissed for lack of jurisdiction under the *Rooker–Feldman* doctrine." *Id.* at 1545–46.

Those two decisions demonstrate that the *Rooker–Feldman* doctrine may deprive district courts and this Court of subject matter jurisdiction over claims related to child custody actions in state court, but their holdings alone do not tell us which of the three claims brought by the plaintiffs in this case are barred. Both *Staley* and *Liedel* involved far more direct attacks on the previous state court judgment than the claims in this case do. In fact, the primary relief sought in each of those two cases was an injunction preventing enforcement of the state court judgment and returning custody to the aggrieved parent. That is an easy case for application of the *Rooker–Feldman* doctrine.

By contrast, in this case the plaintiffs are not seeking injunctive relief that would prevent the enforcement of any child custody orders of the state court. They seek only damages based on the constitutional violations which they allegedly suffered. Because of that, the plaintiffs argue that the lack of a direct attack on the state court judgment and the fact that they seek damages, instead of injunctive relief, take their claims beyond the reach of the *Rooker–Feldman* doctrine. They cite to cases from other circuits in support of their argument, maintaining that we should draw a distinction between cases in which a plaintiff seeks relief that would directly prevent the enforcement of a state court order and cases in which a plaintiff seeks damages under § 1983 based on the issues related to the state case.

But our decisions focus on the federal claim's relationship to the issues involved in the state court proceeding, instead of on the type of relief sought by the plaintiff. *See, e.g., Siegel,* 234 F.3d at 1172. For example, in *Liedel,* even though part of the relief sought by the plaintiffs was damages from the Alabama Department of Human Resources, we held that the plaintiffs' claims were barred because their complaint essentially sought "to challenge the final state court judgment." 891 F.2d at 1544–46. And in *Staley,* 837 F.2d at 1017, we held that the *Rooker–Feldman* doctrine barred claims even though those claims, in part, sought damages to pay for psychiatric care. The *Rooker–Feldman* doctrine is broad enough to bar all federal claims which were, or should have been, central to the state court decision, even if those claims seek a form of relief that might not have been available from the state court.

Applying these principles to the case before us, we readily conclude that the first of the plaintiffs' three claims, the one involving the search, is not "inextricably intertwined" with the state court custody proceeding in the sense that it is premised on the state court having ruled erroneously. While the allegedly illegal search of the plaintiffs' home occurred several days before the state custody proceeding was initiated, no evidence or other information derived from the search was introduced in the state court proceedings or was relied upon by the court when it decided to take away Goodman's custody of Michael. No issue

involving the search was or could have been raised in the custody proceeding. This federal claim may succeed without in any way calling into doubt the state court decision. So, it is not barred.

The other two claims are different matters. One of those claims contends that the Sipos affidavit was false and that the state court's ex parte proceeding violated the plaintiffs' due process rights. Those contentions strike at the heart of the state court's proceedings and judgment, because the state court decided to take away Goodman's custody of Michael only after finding Sipos' affidavit to be credible and finding that the ex parte order was justified. This claim "succeeds only to the extent that the state court wrongly decided" the custody issue. *Siegel*, 234 F.3d at 1172. So, the claim is barred if the plaintiffs had a reasonable opportunity to present it in the state court proceeding, a matter we will discuss shortly.

The plaintiffs' third claim is that Sipos violated Michael's due process rights when she threatened Scott with arrest if he did not return Michael to DFCS. That claim is inextricably intertwined with the state court orders and judgment, because the factual and legal predicate for it was the basis of a motion the plaintiffs filed to have Michael returned to Scott's custody. The state court held a hearing on that motion and denied it. For the plaintiffs to succeed on this claim a federal court would have to conclude that the state court erred. So, this claim, too, is barred if the plaintiffs had a reasonable opportunity to present it to the state court.

*Id.* at 1332-1335.

The constitutional claims in the instant case fall into three categories, none of which seek to overturn or enjoin the state court decree, but instead seek damages. Count One focuses on the initial removal of the child from the plaintiffs' home, and claims that such "summary removal" forever denied and precluded the opportunity for due process regarding the summary and unlawful removal thereby violating

Plaintiffs' fundamental right to the care, custody and control of their son and denying

the protections afforded under the Fourteenth Amendment to the United States

Constitution. (Doc. 22 at 17).  As to the so-called "summary removal" the state court

decided: "That placement of the child in his/her home would be contrary to the best

interests and welfare of the child and that placement out of the home was in the best

interest of the health and safety of the child <u>at the time of removal</u>."  (Doc. 23-1 at 6).

Count One can only succeed to the extent that this decision was wrong.[10]

> Count Two claims that, after the summary removal, the defendant
>
> willfully and intentionally failed to give written notice to the Calhoun
> County Juvenile Court Intake Officer and to the Plaintiffs of the action
> taken and the reasons for taking Oliver Lynn into custody, as mandated
> by §12-15-127, Code of Alabama. Further she failed to immediately
> notify the Juvenile Court of the removal as mandated by §26-14-7, Code
> of Alabama.

_____

[10]  In arguing that she did not have a reasonable opportunity to raise this claim, the
plaintiffs argue that, even if the Constitutional claims could have been raised, "there is nothing
the Juvenile Court could have done to un-ring the bell of the summary removal.  Once Wilson
acted summarily she forever precluded the opportunity to prevent the removal and thereby denied
[p]laintiffs the opportunity for their claim to be heard by the juvenile [c]ourt."   (Doc. 24 at 16).
The court in unclear as to what point the plaintiffs are trying to make here.  The issue of whether
the summary removal was proper <u>was</u> before the state court.  Alabama law provides that if
continued shelter care was not warranted the court "shall order the return of the child." Ala. Code
§ 12-15-309(a).  If the plaintiffs are somehow claiming that the summary removal issue is not
"inextricably intertwined" with the state court's judgment, their underdeveloped argument also
does not make that clear and "the party who invokes the jurisdiction of the court has the burden
of establishing jurisdiction." _Lowery v. Alabama Power Co._, 483 F.3d 1184, 1216 (11th Cir.
2007).  Regardless, focusing on the federal claim's relationship to the issues involved, it is clear
the this claim is  "inextricably intertwined" with the state court judgment regarding the summary
removal.

(Doc. 22 at 19).  She claims that these failures denied

> the opportunity for the Intake Officer to determine that continuation in shelter care was supported by clear and convincing evidence that Oliver Lynn had no parent, legal guardian, legal custodian or other suitable person able to provide supervision and care for Oliver or… [t]he release of Oliver Lynn would present a serious threat of substantial harm to him, §12-15-128 (a) 1; (a)(3); §12-15-128(b) Code of Alabama thereby violating Plaintiffs due process protections afforded under the Fourteenth Amendment to the United States Constitution.

(Doc. 22 at 20).  Like Count One, this count is merely another way of saying that if the defendant had not engaged in this conduct they would not have lost custody.

Similarly, Count Three claims that despite being asked, "[p]rior to and at the hearing [for] a copy of the psychological report from which Wilson based her allegations of dependency and her representation that Sizelove determined Plaintiffs could not safely care for their child . . . Wilson willfully and intentionally refused to provide [p]laintiffs or their appointed counsel access to or a copy of the reports." (Doc. 22 of 22).[11]   "The refusal of Wilson to provide the Sizelove reports denied Plaintiffs the opportunity to know what was being asserted and to refute the same thus denying Plaintiffs the due process protections of the Fourteenth Amendment to the

---

[11]  The defendant claims that there is no provision in Alabama law requiring such production.  (Doc. 23 at 24).  Regardless, the plaintiffs should have asked the state court to require it, instead of agreeing to the entry of an order they now complain about.

Constitution of the United States." (Doc. 22 at 24).[12]  Again, this claim, like Counts One and Two, basically seeks a determination that, if this evidence had been turned over, the plaintiffs would not have lost custody.

Each of the these claims should have been made before the state court and each would, if successful, "effectively nullify" the state court judgment or, "succeed[] only to the extent that the state court wrongly decided the issues [therein]."  They are all "inextricably intertwined" with the state court judgment.

### 3.    *The Plaintiffs Had an Opportunity To Raise These Claims in the State Court*

The plaintiffs argue that they did not have an opportunity to raise their federal claims in state court, claiming that the juvenile court "[lacked] jurisdiction to hear any of the claims before this Court."  (Doc. 24 at 16).  In a footnote, the plaintiffs write: "[Ala. Code] §§ 12-15-114 and 12-15-115 establish[es] the jurisdiction of the Alabama Juvenile Courts.  The Juvenile Court has no jurisdiction to hear federal claims or state law claims of negligence or wantonness."  (Doc. 24 at 16, n. 14).

This argument misses the point.  The question is not whether the plaintiffs

---

[12]  The count also states that when the defendant filed the petition alleging the child's dependency she "willfully and intentionally failed to state in her Complaint/Petition that she had received the evaluations from the psychologist on or about August 26, 2014, some two weeks before she summarily removed Oliver Lynn from the Plaintiffs. Nor did she disclose in her Complaint/Petition that Garrett Counseling reported no issues regarding the caregiving to Oliver Lynn." (Doc. 22 at 21).  The count only alleges a violation of the plaintiffs' Fourteenth Amendment Rights based on the defendant's refusal to provide a copy of the reports.

could have, or did, make her section 1983 claims in the state court.  Instead, as the

Eleventh Circuit noted in *Goodman*, the issue is whether  "[Alabama] law permits

constitutional challenges to a juvenile court's orders to be brought in the juvenile

court." *Goodman*, 259 F.3d at 1334. The Alabama court have recognized that such

challenges can be made, if done in a timely manner. *See, M.H. v. B.F.*, 78 So. 3d 411,

418 (Ala. Civ. App. 2011) (mother's constitutional challenge waived for appellate

review where not first presented to the juvenile court during the dependency

proceedings);  *L.S. v. Shelby Cnty. Dep't of Human Res.*, 28 So. 3d 804, 807 (Ala.

Civ. App. 2009) ("Because the mother failed to show that the constitutional issues she

raises on appeal were 'presented to and reviewed by' the juvenile court, the order of

the juvenile court is due to be affirmed.").

### B.   The Plaintiffs' Request for Discovery

The plaintiffs argue that if the Shelter Care Order is to be relied on by this court

as the basis of a "factual" challenge to subject matter jurisdiction, they must be given

an opportunity for discovery.  (Doc. 24 at 18) (*citing Williamson v. Tucker*, 645 F.2d

404, 414 (5th Cir. 1981) ("the district court must give the plaintiff an opportunity for

discovery and for a hearing that is appropriate to the nature of the motion to

dismiss").  In this case, the plaintiffs merely, and vaguely, request discovery without

setting out its purpose or what they hope to find.

31

The Rule 12(b)(1) motion in this case is only a facial—not factual—challenge. Only the pleadings, and documents referenced in the pleadings have been considered. Regardless, as noted previously, this court can consider matters outside the pleadings on factual challenge as well.  Upon considering the plaintiffs' request, and the nature of the motion, and the materials in the file, the court determines that neither discovery, nor a hearing, is necessary to resolve this attack on its subject matter jurisdiction.  Their request will therefore be denied.

### C.    The Negligence and Wantonness Claims

The parties treat these claims as if they are part of the plaintiffs' "federal claims" which the court has already held are barred by the *Rooker-Feldman* doctrine. The parties have not cited, and the court has found, any authority on whether state law claims are "federal claims" under *Rooker-Feldman* merely because they are filed in federal court.

Regardless, since the court has held that all of the Section 1983 claims are due to be dismissed because this court lacks jurisdiction over them, and since these were the only claims over which the court had original jurisdiction, this court will decline to exercise supplemental jurisdiction over the Negligence and Wantonness claims in

32

Counts Four and Five.  28 U.S.C.A. § 1367(c)(3).[13]

## IV.    CONCLUSION

Based on the foregoing, the plaintiffs' motion for discovery will be **DENIED**,

and the defendant's motion to dismiss will be is **GRANTED**.  An appropriate order

will be entered.

**DONE** and **ORDERED** this 1st day of September, 2015.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[13] Because of the holdings herein, the could will not address the defendant's other arguments, including state agent immunity, qualified immunity, eleventh amendment immunity, 12(b)(6), and statutory immunity.